**11 CIV. 4467**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jonathan Christopher Williams
_____

(In the space above enter the full name(s) of the plaintiff(s).)

-against-

Jimmy Iovine
Universal Music Group
Interscope Records
_____

(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)

**COMPLAINT**

Jury Trial: ☑ Yes  ☐ No
(check one)

RECEIVED
JUN 23 2011
PRO SE OFFICE

I. **Parties in this complaint:**

A. List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff   Name Jonathan Christopher Williams
Street Address 6417 Beltray Road
County, City Charlotte
State & Zip Code North Carolina
Telephone Number 704-533-5747

B. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Rev. 05/2010

Defendant No. 1   Name __Jimmy Iovine__
Street Address __12220 Colorado Ave__
County, City __Santa Monica__
State & Zip Code __California 90404__
Telephone Number __310-865-1000__

Defendant No. 2   Name __Universal Music Group__
Street Address __2220 Colorado Ave.__
County, City __Santa Monica__
State & Zip Code __California 90404__
Telephone Number _____

Defendant No. 3   Name __Interscope Records__
Street Address __2220 Colorado Ave__
County, City __Santa Monica__
State & Zip Code __California 90404__
Telephone Number __310-865-1000__

Defendant No. 4   Name _____
Street Address _____
County, City _____
State & Zip Code _____
Telephone Number _____

## II.   Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction?   *(check all that apply)*
☑ Federal Questions       ☐ Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? __The Constitution Amendment 14 Citizenship Rights Nor shall any state deprive any person of life, liberty or property without due process of the law.__

C.   If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?
Plaintiff(s) state(s) of citizenship __Citizen__
Defendant(s) state(s) of citizenship __Citizen, Corporation, Corporation__

*Rev. 05/2010*

**11 CIV. 4467**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jonathan Christopher Williams
_____
_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Jimmy Iovine
_____
Universal Music Group
Interscope Records
_____
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**COMPLAINT**

Jury Trial: ☒ Yes ☐ No
*(check one)*

RECEIVED JUN 23 2011 PRO SE OFFICE

I.    **Parties in this complaint:**

A.    List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff   Name  Jonathan Christopher Williams
           Street Address  6417 Baltray Road
           County, City  Charlotte
           State & Zip Code  North Carolina
           Telephone Number  704-533-5747

B.    List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

*Rev. 05/2010*

Defendant No. 1    Name  Jimmy Iovine
                   Street Address  2220 Colorado Ave
                   County, City  Santa Monica
                   State & Zip Code  California 90404
                   Telephone Number  310-865-1000

Defendant No. 2    Name  Universal Music Group
                   Street Address  2200 Colorado Ave.
                   County, City  Santa Monica
                   State & Zip Code  California 90404
                   Telephone Number _____

Defendant No. 3    Name  Interscope Records
                   Street Address  2220 Colorado Ave
                   County, City  Santa Monica
                   State & Zip Code  California 90404
                   Telephone Number  310-865-1000

Defendant No. 4    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

**II.   Basis for Jurisdiction:**

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction? *(check all that apply)*

   ☑ Federal Questions            ☐ Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue?  Constitution Amendment 14 Citizenship Rights Nor shall any state deprive any person of life liberty or property without due process of the law.

C.   If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

   Plaintiff(s) state(s) of citizenship  Citizen
   Defendant(s) state(s) of citizenship  Citizen Corporation, Corporation

Rev. 05/2010

### III. Statement of Claim:

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A. Where did the events giving rise to your claim(s) occur? New York, California and Worldwide

B. What date and approximate time did the events giving rise to your claim(s) occur? 2005 - to present day

C. Facts: In the year 2005 I produced a song on 50cent Soundtrack. I have only received 17K dollars in royalties. The album has sold more than 3 million records. Some reports have it selling even way more. The royalty rate per song in 2005 was 8.5 cent. I get half this rate which is .0425 cent this time 3million equals 127500 K dollars. Even if you take the stipulation that the song was in the movie and this would entitle me to half the royalties this would still equal 63750K + an additional 25K = 88,750 because of the stipulation that you get an extra 25K if the song is in the movie. On top of all this while all this was going on 50cent and his gunit crew were assisting in the murders of my childrens mothers and subsequent kidnapping of my children which lead to the looting of my inheritance worth trillions of dollars. Which Jimmy Iovine and Interscope and Universal Music Group have benefitted from greatly. All this behavior including stealing my royalties to keep me from having funds that could have saved some people I knew was endorsed and assisted by these companies and CEO Jimmy Iovine. And they have benefitted greatly from it.

### IV. Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. I suffered severe emotional and physical pain at the hands of the artist they promote and have greatly benefitted off of all his and his groups actions 50cent and the gunit crew. All it takes sometimes is an company to step up and say we dont like what your doing, and we dont condone it, and maybee alot of what has occured could have been avoided. Instead these companies encouraged it, and have greatly benefitted from there artist atrocities committed against me and my children and their mothers, Plus the basic theft of simple royalties I was owed could have helped me prove and stop what has occurred.

Rev. 05/2010

## V. Relief:

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. I am suing for 500 Billion or more determined by how much these companies including the artist they have represented in the past and present have stolen from my inheritance and assisted in the murders of at least 7 different women I have known and children. If I would have simply been paid my royalties like anyone else who does the work I probably would have been able to figure out what was going on by hiring a private detective and lawyer to research the situations. It's unbelievable what these companies will endorse being done to women and children, then willingly get paid off the results of these criminal actions.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 23 day of June, 2011.

Signature of Plaintiff: Jonathan Williams

Mailing Address: 16417 Baltray Road Charlotte NC 28278

Telephone Number: 704 533 5747

Fax Number (if you have one): _____

**Note:** All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

### For Prisoners:

I declare under penalty of perjury that on this _____ day of _____, 20__, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff: _____

Inmate Number: _____

*Rev. 05/2010*

# Get Rich or Die Tryin' (soundtrack)

From Wikipedia, the free encyclopedia

*Get Rich or Die Tryin': Music from and Inspired by the Motion Picture* is the soundtrack by G-Unit Records to the 2005 film *Get Rich or Die Tryin'*. In December 2005, the Recording Industry Association of America (RIAA) certified the album platinum.[7] The album has so far sold over 3 million copies worldwide.

The soundtrack was released after 50 Cent's second multi-platinum album The Massacre and 50 Cent became the third rapper to have an album and a film soundtrack at top of the Billboard 200 at the same year. The other two were Snoop Doggy Dogg in 1994, with Doggystyle and the Murder Was The Case soundtrack, and Eminem in 2002 with The Eminem Show and the 8 Mile soundtrack.



**Get Rich or Die Tryin'**

**Soundtrack album by G-Unit Records**

| | |
|---|---|
| Released | November 8, 2005 |
| Recorded | 2004–2005 |
| Genre | Gangsta rap, Hip hop |
| Length | 65:05 |
| Label | G-Unit, Shady Records, Aftermath Entertainment, Interscope |
| Producer | All-Star, Black Jeruz,, Joanne B-Money "B$", C. Styles, Che Vicious, DJ Khalil, Dr. Dre, Fredwreck, Havoc, Hi-Tek, Jake One, J. R. Rotem, K.O., Kickdrums Productions, Mike Elizondo, Nick Speed, Recognize Reel, Ron Browz, Sha Money XL, Sire, The Outfit |

**Professional reviews**

⚠ The reviews parameter has been deprecated. Please move reviews into the Reception section of the article. See Moving reviews into article space.

- Allmuisc ★ ★ ★ ★ ★[1]
- *Entertainment Weekly*[2]
- HipHopDX ★ ★ ★ ★ ★[3]
- PopMatters (6/10)[4]
- *RapReviews* (7.5/10)[5]
- *Rolling Stone* ★ ★ ★ ★ ★[6]

## Contents

- 1 Singles
- 2 Reception
    - 2.1 Critical Reception
    - 2.2 Commercial performance
- 3 Track listing
- 4 Charts
- 5 References

## Singles

The first single from the soundtrack is "Hustler's Ambition". It is his personal favorite track from the album but it only peaked at #65 on *Billboard* Hot 100. The song is about 50 Cent's rough time growing up and how he had to hustle to keep up with life. The second single, "Window Shopper", peaked at number twenty on the Hot 100. In the edited version's chorus he says that Ja Rule, Jadakiss, Nas, and Fat Joe are window shoppers (50 Cent was feuding with these rappers at the time). The third single, "Best Friend", peaked number thirty-five on the Hot 100. It is used throughout the film as a way for Marcus (50 Cent's character) to lyrically flirt with Charlene. "I'll Whip Your Head Boy" is the final single from the soundtrack.

## Reception

G-UNIT RECORDS, LLC
2220 Colorado Avenue
Santa Monica, CA 90404

Dated as of: October 7, 2005

Outfit, Inc.
f/s/o Jonathan Williams p/k/a "Baby Jay"
c/o Hewitt, Katz & Stepp
2610 Resurgens Plaza
Atlanta, Georgia 30326
Attn : Leron E. Rogers, Esq.

Re: **Outfit, Inc. f/s/o Jonathan Williams p/k/a "Baby Jay" To Produce 50 Cent, Lloyd Banks, Young Buck: "You Already Know"**

Dear Gentlemen:

This letter shall constitute the agreement between G-Unit Records, LLC ("G-Unit") and Outfit, Inc. ("Employer") to furnish the services of the record producer Jonathan Williams p/k/a "Baby Jay" ("Producer") with respect to Producer's services to produce a master recording embodying the performances of 50 Cent, Lloyd Banks, and Young Buck ("Artist"), as follows:

1. (a) G-Unit has engaged Employer to furnish the services of Producer to produce and deliver on an expedited basis "film" and "record" mixes (including, without limitation, a "clean" version and single mixes) satisfactory to G-Unit of a recording (the "Master") embodying the performances of Artist of an original musical composition (the "Composition") tentatively entitled "You Already Know", which Composition shall be subject to G-Unit approval for possible inclusion in the motion picture tentatively entitled "Get Rich or Die Tryin'" (the "Picture"), an album derived from the Picture (the "Album") and single records derived therefrom (the "Single"). It is contemplated that the Picture will be released by Paramount Pictures Corporation ("Paramount"), that the Album will be released by G-Unit and distributed by Interscope Records ("Distributor"). It is also contemplated that Producer will write the music and that Artist will write the lyrics for the Composition.

(b) Producer will comply with G-Unit's reasonable requests and instructions in connection with the services to be rendered hereunder. Without limiting the generality of the foregoing sentence: (i) Producer will produce and deliver the Master satisfactory to G-Unit within the recording budget pre-approved by G-Unit in writing; (ii) Producer will not incur any expenditures or liabilities in excess of the approved budget without G-Unit's prior written consent; (iii) Employer and Producer will indemnify G-Unit from any expenses or liabilities incurred in excess of the approved budget without G-Unit's prior written consent, and (iv) Employer and Producer will indemnify G-Unit from any claims arising from the use of any Embodied Copyrighted Material(s) (defined below) in the Master and/or the Composition. G-Unit acknowledges delivery and acceptance of the Master; however, G-Unit shall not be deemed to have waived either its right to require complete and proper performance hereafter or its remedies for Employer and/or Producer's failure to perform in accordance herewith.

(c) (i) Employer and Producer shall not "interpolate", "quote from", "sample", "borrow" or otherwise adapt any copyrighted music, copyrighted spoken words, copyrighted sounds, copyrighted words, copyrighted compositions and/or copyrighted sound recordings (including, without limitation, any sounds accompanying copyrighted audio-visual works) owned or controlled by persons or entities ("Embodied Copyrighted Materials") in the Master and/or the Composition without having first obtained the written consent of all applicable copyright proprietors of such Embodied Copyrighted Materials and paying for all costs, fees, advances and/or royalties in connection with such consents, approvals and clearances and the like for such Embodied Copyrighted Materials, and Employer's and/or Producer's failure to obtain such written consent shall be deemed a material breach of this agreement; provided, always, that if G-Unit, in the exercise of its reasonable business judgment, believes that Embodied Copyrighted Material furnished by Employer and/or Producer exists without such written consent from the applicable copyright proprietors, G-Unit may withhold monies and/or royalties otherwise payable to Employer/Producer hereunder in amounts reasonably related to potential third party liability as a result thereof.

(ii) It is understood and agreed that Employer and/or Producer shall notify G-Unit, as soon as possible, of all portion(s) of any and all Embodied Copyrighted Material(s) which Producer proposes to be embodied on or interpolated in the Master, including full information about all parties controlling rights in and to such Embodied Copyrighted Material(s). Provided that Employer and/or Producer promptly and accurately notify G-Unit as aforesaid, G-Unit shall assist, with respect to each such Embodied Copyrighted Material which G-Unit approves for embodiment on the Master, in arranging for the authorization and licensing to G-Unit of all necessary rights in connection with the embodiment of such Embodied Copyrighted Material on the Master. In the event that G-Unit elects to cause Producer to remove any such Embodied Copyrighted Material(s) from the Master, Producer shall remove such Embodied Copyrighted Material(s) promptly, at no additional cost and for no additional compensation, and the Master shall not be deemed delivered nor accepted hereunder unless and until Producer has complied with the terms of this sentence. Any and all expenses incurred by G-Unit in arranging for the "clearance" of Embodied Copyrighted Material(s) hereunder as aforesaid shall be deemed approved Recording Costs in connection with the Master which shall not reduce the Producer Advance hereunder. In addition, Employer and Producer shall be responsible for sample clearance advance fees or royalties or other continuing obligations to third parties which may be incurred in connection with Embodied Copyrighted Material(s) hereunder, and such amounts shall be fully recoupable from royalties otherwise becoming payable to Employer and/or Producer hereunder. In the event that an ownership or financial interest in a Composition is granted to a third party such ownership or interest shall reduce Producer's interest herein and Employer and Producer will indemnify G-Unit against any reduction in G-Unit's or Artist's ownership or financial interest and promptly reimburse G-Unit for any consequent loss, damage or reduction in income suffered by G-Unit or Artist from all other monies payable to Employer and Producer hereunder or reimbursable by Employer and/or Producer, if royalties are insufficient. If G-Unit is unable to obtain clearance for any Embodied Copyrighted Material(s) on terms reasonably acceptable to G-Unit, Producer shall remove such Embodied Copyrighted Material(s) from the Master in question at Employer's and Producer's sole cost and expense. Notwithstanding anything to the contrary contained in this agreement, Employer and Producer warrant and represent that, to the extent of Producer's contributions thereto, the Master contains no Embodied Copyrighted Materials.

(iii) Employer and Producer shall pay and be responsible for the clearance of any Embodied Copyrighted Material(s) (or removal of any uncleared Embodied

Copyrighted Material[s]) not approved as provided herein or not disclosed to G-Unit ("Undisclosed Embodied Copyrighted Material[s]"). In the event G-Unit makes any payments to secure any license in connection with any Undisclosed Embodied Copyrighted Material(s), then without limiting any other rights or remedies that G-Unit may have, Employer and/or Producer shall reimburse G-Unit for all costs incurred by G-Unit and/or Artist in connection with any such Undisclosed Embodied Copyrighted Material(s) (including the costs incurred in connection with re-recording, re-mixing, or otherwise re-editing any Master hereunder as a result of having to delete any Undisclosed Embodied Copyrighted Material[s] embodied thereon), and G-Unit shall be entitled to deduct from Employer's and/or Producer's share of any reimbursable costs not promptly reimbursed by Employer and/or Producer from any monies payable to Employer hereunder. To the extent that any Embodied Copyrighted Material(s) and/or Unauthorized Embodied Copyrighted Material(s) result in the conveyance of a copyright interest in the Composition, such transfer shall only reduce Producer's or Producer's designee's respective interest in the applicable composition.

2. (a) Employer and Producer warrant and represent that Producer is not a party to an exclusive songwriter or publishing agreement and that, in accordance with paragraphs 3(a)(i) and 3(a)(ii) below, Producer owns and controls fifty percent (50%) of Producer's contribution to the Composition throughout the world. Employer and Producer acknowledge and confirm that the Composition is separately owned and controlled as follows:

(i) Provided that the Composition is not included in the Picture as theatrically released, Employer and Producer acknowledge and confirm that the Composition shall be separately owned and controlled as follows:

| Writer: | Writer Percent: | Publisher Percent: |
|---|---|---|
| C. Jackson | 15% | 15% |
| C. Lloyd | 20% | 20% |
| D. Brown | 15% | 15% |
| J. Williams | 50% | 50% |

(ii) Provided that the Composition is included in the Picture as theatrically released, Employer and Producer acknowledge and confirm that the Composition shall be separately owned and controlled as follows:

| Writer: | Writer Percent: | Publisher Percent: |
|---|---|---|
| C. Jackson | 15% | 15% |
| C. Lloyd | 20% | 20% |
| D. Brown | 15% | 15% |
| J. Williams | 50% | 25% |
| Paramount Pictures Corporation Music Publishing Designee | 0% | 25% |

Employer and Producer further acknowledge and agree that as between Producer, Paramount, and Artist (or Artist's publishing designee on Artist's behalf), they shall each administer and exploit their respective interests and shares in the Composition, subject to the following:

(b) (i) G-Unit and its designees will each have the perpetual and universe-wide right (but not the obligation) to use and perform the Composition in the Picture (i.e., without limitation as to the number, type or duration of uses), in any and all media now known or hereafter devised and in advertisements and promotions for the Picture in any and all media now known or hereafter devised. Producer hereby grants a synchronization license to G-Unit and its designees for the perpetual and universe-wide right to so use Producer's interest in the Composition in the Picture in any and all media now known or hereafter devised (including, without limitation, home audio-visual devices of the Picture) and in connection with the Picture in any and all media now known or hereafter devised, including, without limitation, in advertisements, trailers and other promotions and co-promotions of the Picture (including, without further limitation, so-called in-context and out-of-context trailers and all music videos).

(ii) Provided that the Composition is included in the Picture as theatrically released, G-Unit will pay or cause to be paid to Producer a synchronization license fee in connection with Producer's interest in the Composition in the amount of Twenty Five Thousand Dollars ($25,000) for the use of one hundred percent (100%) of the Composition in the Picture and otherwise as set forth in this agreement (the "Synch Fee"). The Synch Fee is inclusive of any and all sums due any and all of the writers and publishers of the Composition, including, without limitation, Producer, Producer's publishing designee (if any), Paramount's publishing designee, Artist and Artist's publishing designee and any third party writers and publishers of the Composition, with respect to the use of the Composition in the Picture and otherwise as provided herein, so that each writer and publisher of the Composition shall be paid their proportionate share of such Synch Fee. The Synch Fee will be payable on the later of the theatrical release of the Picture with the Composition embodied therein, or the execution of this agreement.

(c) (i) G-Unit and its designees will each also have the perpetual and universe-wide right (but not the obligation) to use and perform the Composition on records in all configurations and in any and all media now known or hereafter devised, including, without limitation, on the Album and on the Single, and in advertisements and promotions for any record embodying the Composition in any and all media now known or hereafter devised. Producer hereby grants a mechanical license to G-Unit and its licensees and designees for Producer's interest in the Composition, if any, at a rate (the "Controlled Composition Rate") for the United States equal to one hundred percent (100%) of the minimum statutory copyright royalty rate (without regard to playing time), determined as of the date the Master embodying the Composition was initially recorded; and for Canada equal to one hundred percent (100%) of the minimum compulsory rate in Canada (or if there is no such rate, then one hundred percent (100%) of the lowest rate prevailing in Canada on a general basis) determined as of the date the Master embodying the Composition was initially recorded. The Controlled Composition Rate shall be computed, determined, calculated, reduced (but not escalated) and paid in the same manner (e.g., mechanical royalty "cap", free goods, reserves, category variations, etc.) as mechanical royalties are computed, determined, calculated and paid pursuant to Exhibit A, attached hereto and incorporated herein by this reference

(ii) The total mechanical royalty for all compositions on the Album, including the Composition, will be limited to thirteen (13) times the amount which would be payable under paragraph 2(c)(i) above for a record containing only one (1) Composition. The total mechanical royalty on any Single will be limited to two (2) times the amount under paragraph 2(c)(i) above. The total mechanical royalty on any record which is not the Album or the Single or an LP or a single will be limited to three (3) times the amount under paragraph 2(c)(i) above. If any record released by G-Unit contains more than one version or arrangement

of the Composition, G-Unit shall not be obligated to pay more than one (1) time the above rate in respect of such Composition on such record. Without limiting G-Unit's rights, if the aggregate mechanical royalty rate for any record exceeds the rate provided for herein, such excess may be deducted from any and all sums due to you hereunder.

(d) G-Unit and its designees will each also have the perpetual and universe-wide exclusive right (but not the obligation) to, and Producer hereby grants G-Unit and its designees a license to, publish matching folio print editions of the Composition with respect to the Picture and records embodying the Master, including, without limitation, the Album and/or the Single.

(e) The decision as to whether the Composition is ultimately included in the Picture and/or any record (including, without limitation, the Album, the Single) and/or otherwise exploited hereunder will be made by G-Unit in its sole discretion.

3.   (a)   (i)   From inception, G-Unit will own the Composition, the Master (including without limitation, all performances embodied therein), all musical material and other results and proceeds of Employer's and Producer's services hereunder and all rights therein (collectively, the "Musical Material") on an exclusive basis throughout the universe in perpetuity, including, without limitation, all rights of copyright therein and thereto, and may freely utilize all, or any portion of same, in and in connection with the Picture, records (including, without limitation, the Album and the Single), and/or otherwise, in any and all media/manner/formats/methods now known or hereafter devised, on such terms and conditions as G-Unit, in its sole discretion, may deem appropriate, and G-Unit may license or designate others to exercise any or all of its rights; or G-Unit may refrain from any or all of the foregoing. Employer and Producer, specifically acknowledge and agree that the Musical Material shall be created as "works made for hire" for G-Unit (and G-Unit shall be the author thereof) for the purpose of U.S. copyright law and for all other copyright laws throughout the world. If or to the extent for any reason in any country, any of such results and proceeds is/are not recognized to be a "work made for hire" then Producer and Employer hereby irrevocably and absolutely assign to G-Unit all of Producer's and Employer's respective rights (copyrights, rights thereunder and otherwise, whether now or hereafter known) and all renewals and extensions (as may now or hereafter exist) thereof, in and to such results and proceeds, throughout the universe and in perpetuity. If G-Unit so requests, Producer and Employer shall sign and deliver to G-Unit any documents G-Unit may deem necessary to confirm, protect and/or enforce G-Unit's rights hereunder and Employer and Producer hereby grant G-Unit an irrevocable power of attorney coupled with an interest, to sign, verify, acknowledge and deliver any and all such instruments or documents which Employer and/or Producer fail to sign, verify, acknowledge or deliver within a reasonable time after G-Unit's request therefor. Employer and Producer irrevocably and unconditionally waive any and all so called "moral rights," in connection with the Musical Material. Without limiting the generality of the foregoing, Employer and Producer hereby irrevocably and unconditionally waive any right or entitlement that Employer and/or Producer may have pursuant to Sections 77-85 (inclusive) of Chapter IV of the Copyright Designs and Patents Act 1988, or any statutory modifications or enactments thereof or laws of any other jurisdictions. Employer and Producer hereby irrevocably and absolutely assign to G-Unit in perpetuity, on Employer's and/or Producer's behalf and on behalf of their respective successors-in-interest, heirs, executors, administrators, and assigns, all of Employer's and/or Producer's "economic/neighboring" rights in and to the Musical Material, the results and proceeds of Employer's and/or Producer's services hereunder and/or the Picture, the Album and/or the Single and/or any derivative works based on the Musical Material which are, at any time, granted by domestic, foreign, or multi-national legislation, including, but not limited to, EC or other legislation or directives concerning remuneration pursuant to any blank

audio/visual tape levy, rental, lending, public performance rights, so-called "performer's property rights" and/or rights in respect of satellite and cable retransmission broadcasts in EC member states or otherwise. Employer and Producer hereby acknowledge that the compensation set forth in this agreement (including without limitation, the "Producer Advance" (as hereinafter defined), the "Producer Royalty" (as hereinafter defined) and Producer's share of the Synch Fee), includes full, equitable and adequate consideration for this assignment and that such consideration is an adequate part of the revenues derived or to be derived by G-Unit from such rights.

(ii) Notwithstanding the foregoing, Producer shall be entitled to own and administer half of the copyright attributable to Producer's contribution to the Composition (including the writer's share of income) and Paramount shall own and administer the remaining half thereof (i.e., the portion of the Composition attributable to Producer's contribution thereto will be co-published by Producer and Paramount, with each publisher controlling its respective share, subject to the terms hereof). G-Unit shall assign to Producer, Paramount, and any other songwriters rendering services in connection with the Composition, the percentage of the copyright set forth in paragraph 2(a) as attributable to Producer's interest (i.e. fifty percent [50%] in the event the Composition is not included in the Picture as theatrically released and twenty-five percent (25%) in the event the Composition is included in the picture as theatrically released), Paramount's interest, and such other songwriters interest, if any, including any and all extensions and renewals, in and to the Composition throughout the universe with all right, title and interest, including, without limitation, any copyrights, including extensions and renewals, in perpetuity.

(b) G-Unit and its designees shall also have the right, throughout the universe, in perpetuity to use Employer's and Producer's name, approved likeness and approved biographical material in connection with the Picture and the Master in any and all media now known or hereafter devised, including, without limitation, to publicize and/or exploit the Picture and/or the Master and in advertisements, trailers, and other co-promotions and promotions of the Picture (including, without further limitation, so-called in-context and out-of-context trailers and all music video rights), or to refrain therefrom.

4.   In consideration for Producer's services and the grant of rights being made by Employer and Producer to G-Unit with respect to the Master and the Composition, G-Unit will pay or cause to be paid to Employer and Producer the following:

(a) An advance in the amount of Fifteen Thousand Dollars ($15,000) (the "Producer Advance"), which shall be recoupable from any royalties (excluding mechanical royalties) payable to Employer and Producer hereunder, and which is payable promptly following satisfactory delivery of the Master in accordance with Paragraph 1 above and G-Unit's receipt of a copy of this Agreement signed by Producer; and

(b) An Album royalty in respect of the Master equal to three percent (3%) of the suggested retail list price from time to time for net sales through normal retail channels in the United States, pro-rated by the number of royalty bearing selections (i.e., three percent (3%) multiplied by a fraction, the numerator of which is one (1) and the denominator of which is the total number of royalty bearing selections included on the Album) (the "Producer Royalty"). The Producer Royalty in respect to the Master will otherwise be computed as set forth in Exhibit A. No record royalties will be payable to Producer in respect of the Master under this Agreement unless and until the recording costs for the Master and the clearance costs of any Embodied Copyrighted Material, if any, have been recouped at the so-called "net artist" rate

pursuant to Exhibit A. Following such recoupment, Producer's Royalty will be payable retroactive to record one, subject to the recoupment of the above-mentioned Fifteen Thousand Dollars ($15,000) Producer Advance.

(c) G-Unit shall use its good faith efforts to cause Distributor to account for and pay royalties directly to Employer a semi-annual basis in accordance with Distributor's standard accounting procedures. In the event Distributor fails to directly pay and account to Employer, G-Unit shall render accountings and royalty payments to Employer within sixty (60) days after G-Unit's receipt of such accountings and royalty payments from Distributor (which accountings shall not be less than semi-annually). If G-Unit accounts directly to Employer, G-Unit shall be entitled to rely on Distributor's royalty statements to G-Unit in accounting to Employer. Employer acknowledges and agrees that those of G-Unit's books and records concerning the reproduction, sale or other exploitation of the Masters might consist only of accounting statements received by G-Unit from the Distributor (which statements G-Unit may redact to omit information not germane to royalties to be paid or credited to Employer's account) and that G-Unit shall not be responsible for any errors or omissions contained in any such accounting statements rendered to G-Unit by Distributor. Employer and Producer shall be deemed to have consented to each royalty accounting to Employer hereunder, and each such accounting shall become final and binding upon Employer and Producer unless Employer/Producer renders specific written objection, stating the basis thereof at least sixty (60) days prior to the date Distributor's corresponding accounting to G-Unit becomes binding on G-Unit unless suit is instituted thereon at least sixty (60) days prior to the last date G-Unit may institute suit against Distributor on the corresponding accounting to G-Unit. Employer shall have the right at Employer's sole cost and expense to audit G-Unit's books and records which have not been rendered incontestable, but not more than once per twelve (12) month period, relating to the sale of the Album during normal business hours and on reasonable notice. Employer acknowledges and agrees that Employer shall not have any right under this agreement or otherwise to examine or inspect the books and records of the Distributor concerning the reproduction or other exploitation of the Master, to object directly to Distributor (or Distributor's publishing designee) regarding any statements rendered to Employer for reproductions and other exploitations of the Master or to commence or prosecute any claim, demand or action against Distributor (or Distributor's publishing designee) as a result of Distributor's (or Distributor's publishing designee's) accounting or failing to account for royalties of any reproductions or other exploitations of the Master. However, in the event G-Unit shall conduct an audit of Distributor and recover additional monies due and owing to G-Unit and Employer, Employer shall receive Employer's proportionate share of such monies less Employer's proportionate share of reasonable out of pocket audit costs incurred by G-Unit in connection with such audit.

(d) It is hereby acknowledged that G-Unit shall have the right to exploit the Master in any and all media now or hereafter devised, including, without limitation, on records other than the Soundtrack Album, or to refrain therefrom. Employer and Producer acknowledge and confirm that they will look solely to G-Unit for any Producer Royalties due them in respect of G-Unit's exploitation of the Master.

5.   (a)   Provided that the Master is included in the Picture, then G-Unit will use reasonable efforts to instruct Paramount to accord a credit with respect to the Master in the end title crawl of the Picture in substantially the following form, subject to G-Unit's and Paramount's standard policies with respect to such end crawl credits:

"You Already Know"
Written by C. Jackson, C. Lloyd, D. Brown, J. Williams
Produced by Jonathan Williams for The Outfit
Performed by 50 Cent, Lloyd Banks, Young Buck
Courtesy of G-Unit Records, LLC

All other characteristics of this screen credit will be at G-Unit's discretion.

(b) Provided that the Master is included on the Album, then G-Unit will use reasonable efforts to accord credit to Producer on the back cover and/or liner notes thereof together with publisher information in substantially the following form, subject to G-Unit's standard policies with respect to such credits:

"You Already Know"
Written by C. Jackson, C. Lloyd, D. Brown, J. Williams
Produced by Jonathan Williams for The Outfit
Performed by 50 Cent, Lloyd Banks, Young Buck
Courtesy of G-Unit Records, LLC

All other characteristics of this credit will be at G-Unit's discretion.

(c) G-Unit will use reasonable efforts to accord Producer appropriate credit in national trade ads of one-half (1/2) page or larger and Billboard strip ads placed by G-Unit or under its direct control solely relating to a Single embodying the Master as the so-called "A" side thereof. All other characteristics of this credit will be at G-Unit's discretion.

(d) No casual or inadvertent failure to comply with this paragraph 5 shall constitute a breach of this Agreement, and neither Employer nor Producer being entitled to injunctive relief to restrain the continuing use of any material used in contravention of this subparagraph. G-Unit shall, however, use reasonable efforts to correct any such failure on a prospective basis.

6.   Employer and Producer hereby represent and warrant that:

(a) Employer and Producer have the right to enter into and perform this agreement and grant to G-Unit all of the rights set forth herein, free of all third party claims;

(b) Producer's (or anyone engaged by Producer) contributions to the Master is new and original and no part thereof will infringe the rights of any third party;

(c) Producer will not produce or re-record the Composition for any third party for a period of three (3) years from the initial theatrical release of the Picture in the U.S. without G-Unit's prior written consent.

(d) G-Unit shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to G-Unit hereunder, except as specifically provided in this agreement. Employer will pay all royalties or other compensation, except as otherwise set forth in this agreement (e.g. approved and budgeted recording costs) (whether in lieu of royalties or otherwise) becoming due to Producer and any other persons engaged by Employer or Producer who perform or in any way contributed to the recording and/or production of the Master and Composition delivered

**11 CIV. 4467**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jonathan Christopher Williams
_____
_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Jimmy Iovine
_____
Universal Music Group
_____
Interscope Records
_____
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**COMPLAINT**

Jury Trial: ☒ Yes ☐ No
(check one)

RECEIVED JUN 23 2011 PRO SE OFFICE

I. **Parties in this complaint:**

A. List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff
Name Jonathan Christopher Williams
Street Address 6417 Baltray Road
County, City Charlotte
State & Zip Code North Carolina
Telephone Number 704-533-5747

B. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Rev. 05/2010

Defendant No. 1    Name **Jimmy Iovine**
Street Address 12220 Colorado Ave
County, City Santa Monica
State & Zip Code California 90404
Telephone Number 310-865-1000

Defendant No. 2    Name **Universal Music Group**
Street Address 2220 Colorado Ave.
County, City Santa Monica
State & Zip Code California 90404
Telephone Number

Defendant No. 3    Name **Interscope Records**
Street Address 2220 Colorado Ave
County, City Santa Monica
State & Zip Code California 90404
Telephone Number 310-865-1000

Defendant No. 4    Name
Street Address
County, City
State & Zip Code
Telephone Number

## II. Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.  What is the basis for federal court jurisdiction? *(check all that apply)*
    ☑ Federal Questions          ☐ Diversity of Citizenship

B.  If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? **Constitution Amendment 14 Citizenship Rights Nor shall any state deprive any person of life liberty or property without due process of the law.**

C.  If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?
    Plaintiff(s) state(s) of citizenship **Citizen**
    Defendant(s) state(s) of citizenship **Citizen Corporation, Corporation**

Rev. 05/2010

III.    **Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.  Where did the events giving rise to your claim(s) occur? New York, California and Worldwide

B.  What date and approximate time did the events giving rise to your claim(s) occur? 2005 - to present day

C.  Facts: In the year 2005 I produced a song on 50cent soundtrack. I have only received 17K dollars in royalties. The album has sold more than 3 million records. Some reports have it selling even way more. The royal rate per song in 2005 was 8.5 cent. I get half this rate which is .0425 cent this time 3 million equals 127500 K dollars. Even if you take the stipulation that the song was in the movie and this would entitle me to half the royalties this would still equal 63750K + an additional 25K = 88,750 because of the stipulation that you get an extra 25K if the song is in the movie. On top of all this while all this was going on 50cent and his gunit crew were assisting in the murders of my childrens mothers and subsequent kidnapping of my children which lead to the looting of my inheritance worth trillions of dollars. Which Jimmy Iovine and Interscope and Universal Music Group have benefitted from greatly. All this behavior including stealing my royalties to keep me from having funds that could have saved some people I knew was endorsed and assisted by these companies and CEO Jimmy Iovine. And they have benefitted greatly from it.

IV.    **Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. I suffered severe emotional and physical pain at the hands of the artist they promote and have greatly benefitted off of all his and his groups actions 50cent and the gunit crew. All it takes sometimes is an company to step up and say we dont like what your doing, and we dont condone it, and maybe alot of what has occured could have been avoided. Instead these companies encouraged it, and have greatly benefitted from there artist atrocities committed against me and my children and their mothers. Plus the basic theft of simple royalties I was owed could have helped me prove and stop what has occurred.

Rev. 05/2010

## V. Relief:

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. I am suing for 500 Billion or more determined by how much these companies including the artist they have represented in the past and present have stolen from my inheritance and assisted in the murders of at least 7 different women I have known and children. If I would have simply been paid my royalties like anyone else who does the work I probably would have been able to figure out what was going on by hiring a private detective and lawyer to research the situations. Its unbelievable what these companies will endorse being done to women and children, then willingly get paid off the results of these criminal actions.

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 23 day of June, 2011.

Signature of Plaintiff: [signature] Janthu Williams

Mailing Address: 16417 Balfray Road
Charlotte NC
28278

Telephone Number: 704 533 5747

Fax Number (if you have one): ____

**Note:** All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

## For Prisoners:

I declare under penalty of perjury that on this ____ day of _____, 20__, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff: _____

Inmate Number: _____

Rev. 05/2010

# *Get Rich or Die Tryin'* (soundtrack)

From Wikipedia, the free encyclopedia

*Get Rich or Die Tryin': Music from and Inspired by the Motion Picture* is the soundtrack by G-Unit Records to the 2005 film *Get Rich or Die Tryin'*. In December 2005, the Recording Industry Association of America (RIAA) certified the album platinum.[7] The album has so far sold over 3 million copies worldwide.

The soundtrack was released after 50 Cent's second multi-platinum album The Massacre and 50 Cent became the third rapper to have an album and a film soundtrack at top of the Billboard 200 at the same year. The other two were Snoop Doggy Dogg in 1994, with Doggystyle and the Murder Was The Case soundtrack, and Eminem in 2002 with The Eminem Show and the 8 Mile soundtrack.



**Get Rich or Die Tryin'**

**Soundtrack album by G-Unit Records**

| | |
|---|---|
| **Released** | November 8, 2005 |
| **Recorded** | 2004–2005 |
| **Genre** | Gangsta rap, Hip hop |
| **Length** | 65:05 |
| **Label** | G-Unit, Shady Records, Aftermath Entertainment, Interscope |
| **Producer** | All-Star, Black Jeruz,, Joanne B-Money "B$", C. Styles, Che Vicious, DJ Khalil, Dr. Dre, Fredwreck, Havoc, Hi-Tek, Jake One, J. R. Rotem, K.O., Kickdrums Productions, Mike Elizondo, Nick Speed, Recognize Reel, Ron Browz, Sha Money XL, Sire, The Outfit |

**Professional reviews**

⚠ The reviews parameter has been deprecated. Please move reviews into the Reception section of the article. See Moving reviews into article space.

- Allmusic ★★★★★[1]
- *Entertainment Weekly*[2]
- HipHopDX ★★★★★[3]
- PopMatters (6/10)[4]
- *RapReviews* (7.5/10)[5]
- *Rolling Stone* ★★★★★[6]

## Contents

- 1 Singles
- 2 Reception
    - 2.1 Critical Reception
    - 2.2 Commercial performance
- 3 Track listing
- 4 Charts
- 5 References

## Singles

The first single from the soundtrack is "Hustler's Ambition". It is his personal favorite track from the album but it only peaked at #65 on *Billboard* Hot 100. The song is about 50 Cent's rough time growing up and how he had to hustle to keep up with life. The second single, "Window Shopper", peaked at number twenty on the Hot 100. In the edited version's chorus he says that Ja Rule, Jadakiss, Nas, and Fat Joe are window shoppers (50 Cent was feuding with these rappers at the time). The third single, "Best Friend", peaked number thirty-five on the Hot 100. It is used throughout the film as a way for Marcus (50 Cent's character) to lyrically flirt with Charlene. "I'll Whip Your Head Boy" is the final single from the soundtrack.

## Reception

G-UNIT RECORDS, LLC
2220 Colorado Avenue
Santa Monica, CA 90404

Dated as of: October 7, 2005

Outfit, Inc.
f/s/o Jonathan Williams p/k/a "Baby Jay"
c/o Hewitt, Katz & Stepp
2610 Resurgens Plaza
Atlanta, Georgia 30326
Attn : Leron E. Rogers, Esq.

Re: **Outfit, Inc. f/s/o Jonathan Williams p/k/a "Baby Jay" To Produce 50 Cent, Lloyd Banks, Young Buck: "You Already Know"**

Dear Gentlemen:

This letter shall constitute the agreement between G-Unit Records, LLC ("G-Unit") and Outfit, Inc. ("Employer") to furnish the services of the record producer Jonathan Williams p/k/a "Baby Jay" ("Producer") with respect to Producer's services to produce a master recording embodying the performances of 50 Cent, Lloyd Banks, and Young Buck ("Artist"), as follows:

1.  (a)  G-Unit has engaged Employer to furnish the services of Producer to produce and deliver on an expedited basis "film" and "record" mixes (including, without limitation, a "clean" version and single mixes) satisfactory to G-Unit of a recording (the "Master") embodying the performances of Artist of an original musical composition (the "Composition") tentatively entitled "You Already Know", which Composition shall be subject to G-Unit approval for possible inclusion in the motion picture tentatively entitled "Get Rich or Die Tryin'" (the "Picture"), an album derived from the Picture (the "Album") and single records derived therefrom (the "Single"). It is contemplated that the Picture will be released by Paramount Pictures Corporation ("Paramount"), that the Album will be released by G-Unit and distributed by Interscope Records ("Distributor"). It is also contemplated that Producer will write the music and that Artist will write the lyrics for the Composition.

(b)  Producer will comply with G-Unit's reasonable requests and instructions in connection with the services to be rendered hereunder. Without limiting the generality of the foregoing sentence: (i) Producer will produce and deliver the Master satisfactory to G-Unit within the recording budget pre-approved by G-Unit in writing; (ii) Producer will not incur any expenditures or liabilities in excess of the approved budget without G-Unit's prior written consent; (iii) Employer and Producer will indemnify G-Unit from any expenses or liabilities incurred in excess of the approved budget without G-Unit's prior written consent, and (iv) Employer and Producer will indemnify G-Unit from any claims arising from the use of any Embodied Copyrighted Material(s) (defined below) in the Master and/or the Composition. G-Unit acknowledges delivery and acceptance of the Master; however, G-Unit shall not be deemed to have waived either its right to require complete and proper performance hereafter or its remedies for Employer and/or Producer's failure to perform in accordance herewith.

(c)  (i)  Employer and Producer shall **not** "interpolate", "quote from", "sample", "borrow" or otherwise adapt any copyrighted music, copyrighted spoken words, copyrighted sounds, copyrighted words, copyrighted compositions and/or copyrighted sound recordings (including, without limitation, any sounds accompanying copyrighted audio-visual works) owned or controlled by persons or entities ("Embodied Copyrighted Materials") in the Master and/or the Composition without having first obtained the written consent of the applicable copyright proprietors of such Embodied Copyrighted Materials and paying for all costs, fees, advances and/or royalties in connection with such consents, approvals and clearances and the like for such Embodied Copyrighted Materials, and Employer's and/or Producer's failure to obtain such written consent shall be deemed a material breach of this agreement; provided, always, that if G-Unit, in the exercise of its reasonable business judgment, believes that Embodied Copyrighted Material furnished by Employer and/or Producer exists without such written consent from the applicable copyright proprietors, G-Unit may withhold monies and/or royalties otherwise payable to Employer/Producer hereunder in amounts reasonably related to potential third party liability as a result thereof.

(ii)  It is understood and agreed that Employer and/or Producer shall notify G-Unit, as soon as possible, of all portion(s) of any and all Embodied Copyrighted Material(s) which Producer proposes to be embodied on or interpolated in the Master, including full information about all parties controlling rights in and to such Embodied Copyrighted Material(s). Provided that Employer and/or Producer promptly and accurately notify G-Unit as aforesaid, G-Unit shall assist, with respect to each such Embodied Copyrighted Material which G-Unit approves for embodiment on the Master, in arranging for the authorization and licensing to G-Unit of all necessary rights in connection with the embodiment of such Embodied Copyrighted Material on the Master. In the event that G-Unit elects to cause Producer to remove any such Embodied Copyrighted Material(s) from the Master, Producer shall remove such Embodied Copyrighted Material(s) promptly, at no additional cost and for no additional compensation, and the Master shall not be deemed delivered nor accepted hereunder unless and until Producer has complied with the terms of this sentence. Any and all expenses incurred by G-Unit in arranging for the "clearance" of Embodied Copyrighted Material(s) hereunder as aforesaid shall be deemed approved Recording Costs in connection with the Master which shall not reduce the Producer Advance hereunder. In addition, Employer and Producer shall be responsible for sample clearance advance fees or royalties or other continuing obligations to third parties which may be incurred in connection with Embodied Copyrighted Material(s) hereunder, and such amounts shall be fully recoupable from royalties otherwise becoming payable to Employer and/or Producer hereunder. In the event that an ownership or financial interest in a Composition is granted to a third party such ownership or interest shall reduce Producer's interest herein and Employer and Producer will indemnify G-Unit against any reduction in G-Unit's or Artist's ownership or financial interest and promptly reimburse G-Unit for any consequent loss, damage or reduction in income suffered by G-Unit or Artist from all other monies payable to Employer and Producer hereunder or reimbursable by Employer and/or Producer. If royalties are insufficient, If G-Unit is unable to obtain clearance for any Embodied Copyrighted Material(s) on terms reasonably acceptable to G-Unit, Producer shall remove such Embodied Copyrighted Material(s) from the Master in question at Employer's and Producer's sole cost and expense. Notwithstanding anything to the contrary contained in this agreement, Employer and Producer warrant and represent that, to the extent of Producer's contributions thereto, the Master contains no Embodied Copyrighted Materials.

(iii)  Employer and Producer shall pay and be responsible for the clearance of any Embodied Copyrighted Material(s) (or removal of any uncleared Embodied

Copyrighted Material[s]) not approved as provided herein or not disclosed to G-Unit ("Undisclosed Embodied Copyrighted Material[s]"). In the event G-Unit makes any payments to secure any license in connection with any Undisclosed Embodied Copyrighted Material(s), then without limiting any other rights or remedies that G-Unit may have, Employer and/or Producer shall reimburse G-Unit for all costs incurred by G-Unit and/or Artist in connection with any such Undisclosed Embodied Copyrighted Material(s) (including the costs incurred in connection with re-recording, re-mixing, or otherwise re-editing any Master hereunder as a result of having to delete any Undisclosed Embodied Copyrighted Material[s] embodied thereon), and G-Unit shall be entitled to deduct from Employer's and/or Producer's share of any reimbursable costs not promptly reimbursed by Employer and/or Producer from any monies payable to Employer and/or Producer hereunder. To the extent that any Embodied Copyrighted Material(s) and/or Unauthorized Embodied Copyrighted Material(s) result in the conveyance of a copyright interest in the Composition, such transfer shall only reduce Producer's or Producer's designee's respective interest in the applicable composition.

2.  (a)  Employer and Producer warrant and represent that Producer is not a party to an exclusive songwriter or publishing agreement and that, in accordance with paragraphs 3(a)(i) and 3(a)(ii) below, Producer owns and controls fifty percent (50%) of Producer's contribution to the Composition throughout the world. Employer and Producer acknowledge and confirm that the Composition is separately owned and controlled as follows:

(i)  Provided that the Composition is not included in the Picture as theatrically released, Employer and Producer acknowledge and confirm that the Composition shall be separately owned and controlled as follows:

| Writer: | Writer Percent: | Publisher Percent: |
|---|---|---|
| C. Jackson | 15% | 15% |
| C. Lloyd | 20% | 20% |
| D. Brown | 15% | 15% |
| J. Williams | 50% | 50% |

(ii)  Provided that the Composition is included in the Picture as theatrically released, Employer and Producer acknowledge and confirm that the Composition shall be separately owned and controlled as follows:

| Writer: | Writer Percent: | Publisher Percent: |
|---|---|---|
| C. Jackson | 15% | 15% |
| C. Lloyd | 20% | 20% |
| D. Brown | 15% | 15% |
| J. Williams | 50% | 25% |
| Paramount Pictures Corporation Music Publishing Designee | 0% | 25% |

Employer and Producer further acknowledge and agree that as between Producer, Paramount, and Artist (or Artist's publishing designee on Artist's behalf), they shall each administer and exploit their respective interests and shares in the Composition, subject to the following:

(b)  (i)  G-Unit and its designees will each have the perpetual and universe-wide right (but not the obligation) to use and perform the Composition in the Picture (i.e., without limitation as to the number, type or duration of uses), in any and all media now known or hereafter devised and in advertisements and promotions for the Picture in any and all media now known or hereafter devised. Producer hereby grants a synchronization license to G-Unit and its designees for the perpetual and universe-wide right to so use Producer's interest in the Composition in the Picture in any and all media now known or hereafter devised (including, without limitation, home audio-visual devices of the Picture) and in connection with the Picture in any and all media now known or hereafter devised, including, without limitation, in advertisements, trailers and other promotions and co-promotions of the Picture (including, without further limitation, so-called in-context and out-of-context trailers and all music videos).

(ii)  Provided that the Composition is included in the Picture as theatrically released, G-Unit will pay or cause to be paid to Producer a synchronization license fee in connection with Producer's interest in the Composition in the amount of Twenty Five Thousand Dollars ($25,000) for the use of one hundred percent (100%) of the Composition in the Picture and otherwise as set forth in this agreement (the "Synch Fee"). The Synch Fee is inclusive of any and all sums due any and all of the writers and publishers of the Composition, including, without limitation, Producer, Producer's publishing designee (if any), Paramount's publishing designee, Artist and Artist's publishing designee and any third party writers and publishers of the Composition, with respect to the use of the Composition in the Picture and otherwise as provided herein, so that each writer and publisher of the Composition shall be paid their proportionate share of such Synch Fee. The Synch Fee will be payable on the later of the theatrical release of the Picture with the Composition embodied therein, or the execution of this agreement.

(c)  (i)  G-Unit and its designees will each also have the perpetual and universe-wide right (but not the obligation) to use and perform the Composition on records in all configurations and in any and all media now known or hereafter devised, including, without limitation, on the Album and on the Single, and in advertisements and promotions for any record embodying the Composition in any and all media now known or hereafter devised. Producer hereby grants a mechanical license to G-Unit and its licensees and designees for Producer's interest in the Composition, if any, at a rate (the "Controlled Composition Rate") for the United States equal to one hundred percent (100%) of the minimum statutory copyright royalty rate (without regard to playing time), determined as of the date the Master embodying the Composition was initially recorded; and for Canada equal to one hundred percent (100%) of the minimum compulsory rate in Canada (or if there is no such rate, then one hundred percent (100%) of the lowest rate prevailing in Canada on a general basis) determined as of the date the Master embodying the Composition was initially recorded. The Controlled Composition Rate shall be computed, determined, calculated, reduced (but not escalated) and paid in the same manner (e.g., mechanical royalty "cap", free goods, reserves, category variations, etc.) as mechanical royalties are computed, determined, calculated and paid pursuant to Exhibit A, attached hereto and incorporated herein by this reference

(ii)  The total mechanical royalty for all compositions on the Album, including the Composition, will be limited to thirteen (13) times the amount which would be payable under paragraph 2(c)(i) above for a record containing only one (1) Composition. The total mechanical royalty on any Single will be limited to two (2) times the amount under paragraph 2(c)(i) above. The total mechanical royalty on any record which is not the Album or the Single or an LP or a single will be limited to three (3) times the amount under paragraph 2(c)(i) above. If any record released by G-Unit contains more than one version or arrangement

of the Composition, G-Unit shall not be obligated to pay more than one (1) time the above rate in respect of such Composition on such record. Without limiting G-Unit's rights, if the aggregate mechanical royalty rate for any record exceeds the rate provided for herein, such excess may be deducted from any and all sums due to you hereunder.

   (d)   G-Unit and its designees will each also have the perpetual and universe-wide exclusive right (but not the obligation) to, and Producer hereby grants G-Unit and its designees a license to, publish matching folio print editions of the Composition with respect to the Picture and records embodying the Master, including, without limitation, the Album and/or the Single.

   (e)   The decision as to whether the Composition is ultimately included in the Picture and/or any record (including, without limitation, the Album, the Single) and/or otherwise exploited hereunder will be made by G-Unit in its sole discretion.

3. (a)(i)   From inception, G-Unit will own the Composition, the Master (including without limitation, all performances embodied therein), all musical material and other results and proceeds of Employer's and Producer's services hereunder and all rights therein (collectively, the "Musical Material") on an exclusive basis throughout the universe in perpetuity, including, without limitation, all rights of copyright therein and thereto, and may freely utilize all, or any portion of same, in and in connection with the Picture, records (including, without limitation, the Album and the Single), and/or otherwise, in any and all media/manner/formats/methods now known or hereafter devised, on such terms and conditions as G-Unit, in its sole discretion, may deem appropriate, and G-Unit may license or designate others to exercise any or all of its rights; or G-Unit may refrain from any or all of the foregoing. Employer and Producer, specifically acknowledge and agree that the Musical Material shall be created as "works made for hire" for G-Unit (and G-Unit shall be the author thereof) for the purpose of U.S. copyright law and for all other copyright laws throughout the world. If or to the extent for any reason in any country, any of such results and proceeds is/are not recognized to be a "work made for hire" then Producer and Employer hereby irrevocably and absolutely assign to G-Unit all of Producer's and Employer's respective rights (copyrights, rights thereunder and otherwise, whether now or hereafter known) and all renewals and extensions (as may now or hereafter exist) thereof, in and to such results and proceeds, throughout the universe and in perpetuity. If G-Unit so requests, Producer and Employer will sign and deliver to G-Unit any documents G-Unit may deem necessary to confirm, protect and/or enforce G-Unit's rights hereunder and Employer and Producer hereby grant G-Unit an irrevocable power of attorney coupled with an interest, to sign, verify, acknowledge and deliver any and all such instruments or documents which Employer and/or Producer fail to sign, verify, acknowledge or deliver within a reasonable time after G-Unit's request therefor. Employer and Producer irrevocably and unconditionally waive any and all so called "moral rights," in connection with the Musical Material. Without limiting the generality of the foregoing, Employer and Producer hereby irrevocably and unconditionally waive any right or entitlement that Employer and/or Producer may have pursuant to Sections 77-85 (inclusive) of Chapter IV of the Copyright Designs and Patents Act 1988, or any statutory modifications or enactments thereof or laws of any other jurisdictions. Employer and Producer hereby irrevocably and absolutely assign to G-Unit in perpetuity, on Employer's and/or Producer's behalf and on behalf of their respective successors-in-interest, heirs, executors, administrators, and assigns, all of Employer's and/or Producer's "economic/neighboring" rights in and to the Musical Material, the results and proceeds of Employer's and/or Producer's services hereunder and/or the Picture, the Album and/or the Single and/or any derivative works based on the Musical Material which are, at any time, granted by domestic, foreign, or multi-national legislation, including, but not limited to, EC or other legislation or directives concerning remuneration pursuant to any blank audio/visual tape levy, rental, lending, public performance rights, so-called "performer's property rights" and/or rights in respect of satellite and cable retransmission broadcasts in EC member states or otherwise. Employer and Producer hereby acknowledge that the compensation set forth in this agreement (including without limitation, the "Producer Advance" (as hereinafter defined), the "Producer Royalty" (as hereinafter defined) and Producer's share of the Synch Fee), includes full, equitable and adequate consideration for this assignment and that such consideration is an adequate part of the revenues derived or to be derived by G-Unit from such rights.

   (ii)   Notwithstanding the foregoing, Producer shall be entitled to own and administer half of the copyright attributable to Producer's contribution to the Composition (including the writer's share of income) and Paramount shall own and administer the remaining half thereof (i.e., the portion of the Composition attributable to Producer's contribution thereto will be co-published by Producer and Paramount, with each publisher controlling its respective share, subject to the terms hereof). G-Unit shall assign to Producer, Paramount, and any other songwriters rendering services in connection with the Composition, the percentage of the copyright set forth in paragraph 2(a) as attributable to Producer's interest (i.e. fifty percent [50%] in the event the Composition is not included in the Picture as theatrically released and twenty-five percent (25%) in the event the Composition is included in the picture as theatrically released), Paramount's interest, and such other songwriters interest, if any, including any and all extensions and renewals, in and to the Composition throughout the universe with all right, title and interest, including, without limitation, any copyrights, including extensions and renewals, in perpetuity.

   (b)   G-Unit and its designees shall also have the right, throughout the universe, in perpetuity to use Employer's and Producer's name, approved likeness and approved biographical material in connection with the Picture and the Master in any and all media now known or hereafter devised, including, without limitation, to publicize and/or exploit the Picture and/or the Master and in advertisements, trailers, and other co-promotions and promotions of the Picture (including, without further limitation, so-called in-context and out-of-context trailers and all music video rights), or to refrain therefrom.

4. In consideration for Producer's services and the grant of rights being made by Employer and Producer to G-Unit with respect to the Master and the Composition, G-Unit will pay or cause to be paid to Employer and Producer the following:

   (a)   An advance in the amount of Fifteen Thousand Dollars ($15,000) (the "Producer Advance"), which shall be recoupable from any royalties (excluding mechanical royalties) payable to Employer and Producer hereunder, and which is payable promptly following satisfactory delivery of the Master in accordance with Paragraph 1 above and G-Unit's receipt of a copy of this Agreement signed by Producer; and

   (b)   An Album royalty in respect of the Master equal to three percent (3%) of the suggested retail list price from time to time for net sales through normal retail channels in the United States, pro-rated by the number of royalty bearing selections (i.e., three percent (3%) multiplied by a fraction, the numerator of which is one (1) and the denominator of which is the total number of royalty bearing selections included on the Album) (the "Producer Royalty"). The Producer Royalty in respect to the Master will otherwise be computed as set forth in Exhibit A. No record royalties will be payable to Producer in respect of the Master under this Agreement unless and until the recording costs for the Master and the clearance costs of any Embodied Copyrighted Material, if any, have been recouped at the so-called "net artist" rate pursuant to Exhibit A. Following such recoupment, Producer's Royalty will be payable retroactive to record one, subject to the recoupment of the above-mentioned Fifteen Thousand Dollars ($15,000) Producer Advance.

   (c)   G-Unit shall use its good faith efforts to cause Distributor to account for and pay royalties directly to Employer a semi-annual basis in accordance with Distributor's standard accounting procedures. In the event Distributor fails to directly pay and account to Employer, G-Unit shall render accountings and royalty payments to Employer within sixty (60) days after G-Unit's receipt of such accountings and royalty payments from Distributor (which accountings shall not be less than semi-annually). If G-Unit accounts directly to Employer, G-Unit shall be entitled to rely on Distributor's royalty statements to G-Unit in accounting to Employer. Employer acknowledges and agrees that those of G-Unit's books and records concerning the reproduction, sale or other exploitation of the Masters might consist only of accounting statements received by G-Unit from the Distributor (which statements G-Unit may redact to omit information not germane to royalties to be paid or credited to Employer's account) and that G-Unit shall not be responsible for any errors or omissions contained in any such accounting statements rendered to G-Unit by Distributor. Employer and Producer shall be deemed to have consented to each royalty accounting to Employer hereunder, and each such accounting shall become final and binding upon Employer and Producer unless Employer/Producer renders specific written objection, stating the basis thereof at least sixty (60) days prior to the date Distributor's corresponding accounting to G-Unit becomes binding on G-Unit unless suit is instituted thereon at least sixty (60) days prior to the last date G-Unit may institute suit against Distributor on the corresponding accounting to G-Unit. Employer shall have the right at Employer's sole cost and expense to audit G-Unit's books and records which have not been rendered incontestable, but not more than once per twelve (12) month period, relating to the sale of the Album during normal business hours and on reasonable notice. Employer acknowledges and agrees that Employer shall not have any right under this agreement or otherwise to examine or inspect the books and records of the Distributor concerning the reproduction or other exploitation of the Master, to object directly to Distributor (or Distributor's publishing designee) regarding any statements rendered to Employer for reproductions and other exploitations of the Master or to commence or prosecute any claim, demand or action against Distributor (or Distributor's publishing designee) as a result of Distributor's (or Distributor's publishing designee's) accounting or failing to account for royalties of any reproductions or other exploitations of the Master. However, in the event G-Unit shall conduct an audit of Distributor and recover additional monies due and owing to G-Unit and Employer, Employer shall receive Employer's proportionate share of such monies less Employer's proportionate share of reasonable out of pocket audit costs incurred by G-Unit in connection with such audit.

   (d)   It is hereby acknowledged that G-Unit shall have the right to exploit the Master in any and all media now or hereafter devised, including, without limitation, on records other than the Soundtrack Album, or to refrain therefrom. Employer and Producer acknowledge and confirm that they will look solely to G-Unit for any Producer Royalties due them in respect of G-Unit's exploitation of the Master.

5. (a)   Provided that the Master is included in the Picture, then G-Unit will use reasonable efforts to instruct Paramount to accord a credit with respect to the Master in the end title crawl of the Picture in substantially the following form, subject to G-Unit's and Paramount's standard policies with respect to such end crawl credits:

"You Already Know"
Written by C. Jackson, C. Lloyd, D. Brown, J. Williams
Produced by Jonathan Williams for The Outfit
Performed by 50 Cent, Lloyd Banks, Young Buck
Courtesy of G-Unit Records, LLC

All other characteristics of this screen credit will be at G-Unit's discretion.

   (b)   Provided that the Master is included on the Album, then G-Unit will use reasonable efforts to accord credit to Producer on the back cover and/or liner notes thereof together with publisher information in substantially the following form, subject to G-Unit's standard policies with respect to such credits:

"You Already Know"
Written by C. Jackson, C. Lloyd, D. Brown, J. Williams
Produced by Jonathan Williams for The Outfit
Performed by 50 Cent, Lloyd Banks, Young Buck
Courtesy of G-Unit Records, LLC

All other characteristics of this credit will be at G-Unit's discretion.

   (c)   G-Unit will use reasonable efforts to accord Producer appropriate credit in national trade ads of one-half (1/2) page or larger and Billboard strip ads placed by G-Unit or under its direct control solely relating to a Single embodying the Master as the so-called "A" side thereof. All other characteristics of this credit will be at G-Unit's discretion.

   (d)   No casual or inadvertent failure to comply with this paragraph 5 shall constitute a breach of this Agreement, and neither Employer nor Producer shall be entitled to injunctive relief to restrain the continuing use of any material used in contravention of this subparagraph. G-Unit shall, however, use reasonable efforts to correct any such failure on a prospective basis.

6. Employer and Producer hereby represent and warrant that:

   (a)   Employer and Producer have the right to enter into and perform this agreement and grant to G-Unit all of the rights set forth herein, free of all third party claims;

   (b)   Producer's (or anyone engaged by Producer) contributions to the Master is new and original and no part thereof will infringe the rights of any third party;

   (c)   Producer will not produce or re-record the Composition for any third party for a period of three (3) years from the initial theatrical release of the Picture in the U.S. without G-Unit's prior written consent.

   (d)   G-Unit shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to G-Unit hereunder, except as specifically provided in this agreement. Employer will pay all royalties or other compensation, except as otherwise set forth in this agreement (e.g. approved and budgeted recording costs) (whether in lieu of royalties or otherwise) becoming due to Producer and any other persons engaged by Employer or Producer who perform or in any way contributed to the recording and/or production of the Master and Composition delivered

hereunder;

(e) Employer is and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing under the laws of its state or country of incorporation; that it is a bona fide corporate business entity established for a valid business purpose within the meaning of tax laws of the United States and not a mere sham, conduit or agent for Producer; that Producer is under an exclusive written contract of employment with Employer for a term extending at least until completion of all services required of Producer hereunder, which contract gives Employer the right to loan or furnish the services of Producer to G-Unit as herein provided; that, if Employer was incorporated outside the United States of America, Employer is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States, as this term is defined in the Tax Treaty between the United States and the country of incorporation; and that Employer does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on Employer's behalf. Employer further represents and warrants that Employer will discharge all of an employer's obligations under any federal, state or local laws, including without limitation, those relating to the withholding of taxes, unemployment and workmen's compensation insurance and social security. Employer further acknowledges that the foregoing representations and warranties will be relied upon by G-Unit for the purpose of determining whether or not it is necessary to make withholdings for United States federal taxes or otherwise from monies being paid to Employer hereunder, and Employer agrees that if withholdings are not made from said payments, and if thereafter it is determined that such withholdings were legally required, Employer and Producer will indemnify G-Unit against all loss, costs, damages and expenses relating thereto; and

(f) Employer has and hereby grants to G-Unit all rights acquired and to be acquired under the aforesaid employment contract with Producer which are necessary or desirable to enable G-Unit to exercise G-Unit rights hereunder. Employer and Producer authorize G-Unit to enforce provisions of the aforesaid contract in Employer's and/or Producer's name or in G-Unit's name.

(g) All of Employer and Producer's representations and warranties shall be true and correct upon execution hereof and upon delivery of the Master, and shall remain in effect for so long as Artist, G-Unit, Distributor, its licensees, assignees, transferees or successors in interest have any rights in or to the Master. G-Unit's acceptance of the Master or other materials hereunder shall not constitute a waiver of any of Employer and/or Producer's representations, warranties or agreements in respect thereof.

7. Employer and Producer agree to indemnify G-Unit, Paramount, Distributor, and each of their successors and assignees from any claims, losses or damages (including without limitation, reasonable legal fees and reasonable outside attorneys' fees) arising out of a breach of any representation or warranty made by Employer and/or Producer herein, provided any such claim has been fully adjudicated or settled with Employer's and/or Producer's written consent (not to be unreasonably withheld). This Agreement, at the election of G Unit, shall also inure to the benefit of G-Unit's successors, assigns, licensees and grantees and Employer and Producer agree that G-Unit and any such subsequent assign may freely assign this Agreement and grant or license any and all rights, privileges and benefits hereunder, in whole or in part, to any person, firm or corporation. The services to be performed by Employer and Producer hereunder are personal to Employer and Producer, respectively, and may not be assigned by Employer or Producer.

8. No failure by G-Unit to perform any of its obligations hereunder will constitute a breach of this agreement unless Employer has given G-Unit notice of such non-performance and G-Unit fails to cure such non-performance within thirty (30) days of its receipt of such notice.

9. Employer acknowledges that Employer and Producer's services hereunder, as well as the Master recorded and the rights and privileges granted to G-Unit under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by Employer or Producer of any material term, condition, representation, warranty or covenant contained herein, G-Unit will be caused irreparable injury and damage. Employer expressly agrees that G-Unit shall be entitled to an injunction and other equitable relief to prevent or remedy a breach of this agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which G-Unit may have. Nothing contained in this paragraph 9 shall be deemed to preclude Employer or Producer from opposing such application for relief.

10. The respective addresses of G-Unit and Employer for all purposes of this agreement shall be as set forth above until notice of a new address shall be duly given. Any notice desired or required to be given by either party to the other shall be in writing and shall be delivered by Federal Express or similar overnight courier or sent by United States certified mail, postage prepaid, return receipt requested, provided that any royalty statement may be sent by regular mail. Properly addressed notices delivered or sent as provided herein shall be deemed given when delivered by hand, or when postmarked if delivered by mail. Copies of notices to G-Unit shall be forwarded to Attn: Theodor K. Sedlmayr, Esq., Sedlmayr & Associates, P.C., 200 Park Avenue South, Ste. 1408, New York, New York 10003. Copies of notices to Producer shall be forwarded to Hewitt, Katz & Stepp, 2610 Resurgens Plaza, Atlanta, Georgia 30326, Attn: Leron E. Rogers, Esq.however failure to send a copy of notice will not impact the effectiveness of such notice and will not constitute a material breach of the agreement.

11. In the event of a breach or alleged breach of this agreement by G-Unit, neither Producer nor Employer will be entitled to rescind this agreement or any of the rights granted to G-Unit or hereunder nor shall Employer or Producer be entitled to restrain, enjoin or otherwise impair the exploitation of the Picture or the Album or the Single or any music video embodying the Master or any rights therein; their sole remedy being an action at law for damages, if any.

12. This agreement cannot be canceled, modified, amended or waived, in part or in full, in any way except by an instrument in writing signed by the party to be charged. No waiver by G-Unit or Employer and/or Producer whether express or implied, of any provision of this agreement or any default hereunder shall affect the other's right to thereafter enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. This agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District courts located in New York County; provided, however, if G-Unit is sued or joined in any other court or forum in respect of any matter which may give rise to a claim by G-Unit hereunder, Employer and Producer consent to the jurisdiction of such court or from over any such claim which may be asserted by G-Unit. Should any paragraph or provision of this agreement be held to be void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. Nothing contained in this

agreement shall be deemed to constitute a partnership or joint venture between the parties hereto.

13. Each party acknowledges that (a) it has either (i) retained separate and independent counsel and has been fully advised regarding every aspect of this agreement, or (ii) was advised by the other party to retain separate and independent counsel but chose not to retain said counsel; (b) neither party in any sense participated in the selection of the other party's counsel or, if applicable, the other party's decision not to retain counsel; (c) it has read and understood this agreement; (d) it believes the provisions of this agreement to be fair and equitable; and (e) This agreement shall not be construed against either party as the drafter, it being agreed that this agreement has been drafted jointly by the parties.

Please indicate your acceptance of the above by signing below.

Sincerely,

G-UNIT RECORDS, LLC

By:_____

AGREED TO AND ACCEPTED:

Outfit, Inc.

By: _[signature]_

ACKNOWLEDGED AND CONFIRMED:

Insofar as it relates to them:

Interscope Records

By:_____

PARAMOUNT PICTURES CORPORATION

By:_____

### INDUCEMENT AGREEMENT

In order to induce G-Unit Records, LLC ("Company") to enter into the foregoing agreement ("Agreement") with Outfit, Inc. ("Producer") I the undersigned hereby:

(a) acknowledge that I have read and am familiar with all the terms and conditions of the Agreement;

(b) assent to the execution of the Agreement and agree to be bound by the terms and conditions thereof, including but not limited to each and every provision of the Agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the Agreement by the undersigned and by Producer.

(c) acknowledge and agree that Company and Distributor shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement and for or in connection with the services rendered by the undersigned or in connection with the rights granted to Company and Distributor thereunder and the fulfillment of the undersigned's obligations pursuant to the Agreement.

ACCEPTED AND AGREED:

_[signature]_

Jonathan Williams p/k/a "Baby Jay"

SS#: 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
13-4076185